IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| **InterimLNHA, INC.,** | ) |
| **Plaintiff,** | ) Case No. _____ |
| vs. | ) |
| **PARKVIEW HOME, INC.; FARMERS STATE BANK; and CHRISTOPHER D. GRAY, an individual,** | ) **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| **Defendants.** | ) |

COMES NOW the Plaintiff, InterimLNHA, Inc., by and through its attorney, and for its Complaint against Defendants Parkview Home, Inc., Farmers State Bank, and Christopher D. Gray, states and alleges as follows:

## PARTIES

1. Plaintiff InterimLNHA, Inc. ("Interim") is a corporation organized under the laws of and registered to do business in the state of Delaware with its principal place of business in Tennessee.

2. Defendant Parkview Home, Inc. ("Parkview") is a corporation organized under the laws of the state of Nebraska, and, based on information and belief, registered to do business and doing business in the state of Nebraska. On information and belief, Parkview's principal place of business is Dodge, Nebraska.

3. Defendant Farmers State Bank ("Farmers") is a corporation organized under the laws of the state of Nebraska, and, on information and belief, registered to do business and doing business in the state of Nebraska. On information and belief, Farmers' principal place of business is Dodge, Nebraska.

4. Defendant Christopher D. Gray ("Gray") is an individual who at all times relevant hereto was a resident and citizen of the state of Nebraska. Gray is and has been an employee of Farmers as a Loan Officer.

## JURISDICTION AND VENUE

5. Jurisdiction of this matter is predicated on diversity of citizenship, 28 U.S.C. § 1332, wherein the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States.

6. This Court has personal jurisdiction over all Defendants because all Defendants do substantial business in this District and the contracts that are the subject of this dispute were to be performed here. In addition, Interim and Parkview entered into an Asset Purchase Agreement wherein the parties designated this jurisdiction as a proper forum for dispute resolution.

7. Venue is proper under 28 U.S.C. § 1391(b)(1) because all Defendants are residents of the State in which this District is located; under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred in this District; under 28 U.S.C. § 1391(c)(1) because the natural person Gray resides in this District; and under 28 U.S.C. § 1391(c)(2) because the entities Parkview and Farmers reside in this District.

## BACKGROUND FACTS
### The Parties

8. Interim specializes in advising and managing nursing home and care facilities.

9. Parkview is a nursing home located in Dodge, Nebraska. According to its website, Parkview is a 62-bed facility that provides long- and short-term skilled care.

10. Farmers is a community bank with a branch in Dodge, Nebraska.

11. Gray is an employee with Farmers and serves as the main advisor to Parkview's Board of Directors ("Board").

## Management Agreement

12. On February 14, 2020, Interim and Parkview entered into a two-page Letter of Agreement ("Management Agreement"), executed by Dan Stockdale, President of Interim, and Paul Pieper, President of Parkview.

13. The initial term of the Management Agreement ended on February 11, 2021. The parties subsequently agreed to extend the term until either March 31, 2022, or the close of the asset sale contemplated by the Asset Purchase Agreement, which is described below.

14. Under the terms of the Management Agreement, Interim advises and manages Parkview on all aspects of its operation. In exchange, Parkview pays Interim appropriate compensation, including but not limited to a monthly fee of 7.5% of the prior month's total gross revenue, plus expenses.

15. If Parkview fails to pay the monthly fee in full, a monthly late fee accrues. The late fee is the greater of (i) 1.5% of the invoice total for each month any portion of the balance is past due, or (ii) the state maximum allowable interest rate and penalties. Under the terms of the Management Agreement, Parkview also must pay all attorney fees and collection costs incurred by Interim to collect any outstanding debt.

16. Nothing in the Management Agreement or any other agreement permits Parkview to unilaterally terminate the Management Agreement.

17. Attached hereto as **Exhibit A** is a true and correct copy of the Management Agreement.

### Asset Purchase Agreement

18. On March 31, 2020, Interim, Dan Stockdale, and Parkview entered into a seven-page (including exhibits) Asset Purchase Agreement ("APA"), executed by Dan Stockdale, in both his capacity as President of Interim and individually, and Paul Pieper, in his capacity as President of Parkview. The APA was drafted by Parkview.

19. Since the transaction did not close before March 31, 2021, the terms of the APA provide that Parkview will sell Interim most of its assets, as defined in the APA, in exchange for the greater of the following:

   i. $1,300,000.00; or

   ii. an amount sufficient for Parkview to (i) satisfy its indebtedness to Farmers; (ii) pay in full all other obligations and liabilities not assumed by Interim; and (iii) distribute to Parkview's shareholders $656.25 per share.

20. Under the terms of the APA, the closing shall occur no later than March 31, 2022.

21. The APA permits termination by one party only if closing has not occurred by March 31, 2022; otherwise, the APA can only be terminated by mutual agreement of the parties.

22. Under the terms of the APA, Parkview provided further assurances that it would generally cooperate with the reasonable requests of Interim and Dan Stockdale in furtherance of the sale.

23. Attached hereto as **Exhibit B** is a true and correct copy of the APA.

### Parkview's Breach of Management Agreement

24. On October 14, 2021, Parkview sent a letter ("October 14 Letter") to Interim purporting to terminate the Management Agreement.

25. As of the date of the October 14 Letter, the asset sale detailed in the APA had yet to close, and the Management Agreement remained in full effect.

26. In the October 14 Letter, Parkview stated that it was terminating the Management Agreement "for a variety of reasons which the Board has determined to be for cause." Parkview did not describe those reasons in the letter.

27. In the October 14 Letter, Parkview stated that it nonetheless intended to honor the APA.

28. Interim has complied with all terms and conditions of the Management Agreement.

29. At the time of its attempted unilateral termination, Parkview owed Interim $18,301.43, which became due and owing prior to the purported and improper termination in the October 14 Letter.

30. Interim continues to incur additional damages for Interim's breach of the Management Agreement as more monthly fees go unpaid and interest accrues.

## Parkview's Breach of the APA

31. On October 29, 2021, in correspondence from Parkview's counsel, Parkview purported to terminate the APA.

32. In the correspondence, Parkview claimed that its unilateral termination of the Management Agreement also terminated the APA.

33. Neither the Management Agreement nor the APA states that termination of the Management Agreement thereby terminates the APA. By their terms, the Management Agreement and APA are separate agreements except where specifically cross-referenced therein.

34. Parkview's position is belied by its October 14 Letter, in which Parkview explicitly stated that it intended to honor the APA despite its purported termination of the Management Agreement.

35. On information and belief, Parkview has renounced the APA because it believes it can sell the facility for a higher sale price on the open market.

36. For the above reason, Parkview decided to employ pretextual and legally unsupported reasoning in an attempt to terminate the APA and thereby deprive Interim of the benefit of its bargain.

37. Additionally, on information and belief, Gray has actively encouraged Parkview, Paul Pieper, and other members of the Board to terminate the APA, thereby illegally interfering with Interim's business expectancies.

38. Interim is ready, willing, and able to close on the APA at any time, and has communicated the same to Parkview.

**Parkview's Mismanagement of its Assets**

39. Since Parkview's attempted termination of the Management Agreement, it has made several decisions regarding the management of its nursing facility that have been detrimental to the facility's operations and value.

40. For example, Parkview forced the resignation of Candace Gibson, Parkview's Nursing Home Administrator. Parkview forced Gibson to resign after she informed Interim of secret meetings between Parkview and Gray.

41. In one of those secret meetings, Gray called Gibson and the Director of Nursing ("Director"), to inform them that Parkview planned to cancel the Management Agreement and take back the nursing home. Gray told Candace and the Director that the meeting was

confidential and warned of "serious consequences" if either informed Interim of the plan. After Gibson informed Interim, Parkview forced her to resign.

42. Gibson successfully guided Parkview through a state survey in October 2021, and Interim is not aware of *any* leadership, competence, or performance issues related to her time at Parkview.

43. Forcing Gibson to resign has had a negative impact on Parkview and its assets.

44. Additionally, Parkview rehired the Director of Nursing ("Director"), who had previously been terminated for cause.

45. Shortly after he was rehired, the Director began to sabotage the operations at Parkview.

46. He untruthfully told a nearby hospital that Parkview was not accepting any new referrals, despite the fact that he lacks the authority to accept or reject residents.

47. The Director's sabotage resulted in two natives of Dodge, Nebraska, not electing to reside at Parkview, which they otherwise would have.

48. Parkview's focus on vindictively harming Interim and failure to adhere to its legally binding agreements with Interim is negatively affecting the residents of Parkview, who are being denied the care, attention, and management they require and which Interim provided prior to the unilateral termination of the Management Agreement.

### Interference by Gray

49. Parkview and Farmers both operate in Dodge, Nebraska.

50. Based on information and belief, Parkview is indebted to Farmers on various loans and other debt obligations in the approximate amount of $1,200,000.00.

51. Gray is an employee of Farmers and the Loan Officer on Parkview's debt obligations with Farmers. Gray is also the main advisor of Parkview's Board. By information and belief, Parkview, Farmers, and Gray maintain a close relationship.

52. Gray led at least one confidential meeting outside the presence of Interim to discuss the management and future direction of Parkview.

53. On information and belief, at that confidential meeting and at other times, Gray used his position as lender to Parkview to coerce the Board to renounce the Management Agreement and APA.

54. Shortly thereafter, Parkview unilaterally terminated the APA.

## COUNT I
### Declaratory Judgment (APA)
(Against Parkview)

55. Interim incorporates the allegations of the foregoing paragraphs as if fully set forth herein.

56. Pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, Interim brings this matter before the Court for the purpose of declaring the rights, status, and other legal relations of Interim and Parkview under the terms of the APA.

57. Specifically, Interim seeks a declaration that:

    i. Interim has complied with all terms and conditions of the APA and has not breached any terms or conditions of the APA;

    ii. Parkview has no right to unilaterally terminate the APA;

    iii. The APA is valid and enforceable; and

    iv. Parkview must work in good faith to close the transaction detailed

in the APA as soon as possible, but no later than March 31, 2022, per the express terms of the APA.

58. A declaratory judgment is appropriate in this matter because there is an actual and justiciable controversy involving the legal relations of Interim and Parkview, and because the controversy is ripe for judicial determination.

59. Pursuant to Federal Rule of Civil Procedure 57, the Court may order a speedy hearing of a declaratory-judgment action. Given the time-sensitive nature of this matter, Interim respectfully requests that this Court order a speedy hearing.

## COUNT II
### Breach of Contract (Management Agreement)
**(Against Parkview)**

60. Interim incorporates the allegations of the foregoing paragraphs as if fully set forth herein.

61. Interim and Parkview are parties to the Management Agreement.

62. Under the terms of the Management Agreement, Parkview agreed to pay Interim appropriate compensation, including but not limited to a monthly fee.

63. Under the terms of the Management Agreement, Parkview may not unilaterally terminate the contract.

64. Parkview breached and continues to breach the terms of the Management Agreement in multiples ways, including but not limited, failing to pay the monthly fee for any month beginning in October 2021, and attempting to unilaterally terminate the contract.

65. Parkview's material breaches of the Management Agreement are the direct and proximate cause of damages to Interim.

66. As a proximate result of the acts alleged above, Interim has suffered and continues to suffer actual damages in amounts including but not limited to (a) monthly fees, (b) monthly late fees, (c) interest, and (d) attorney fees and collection costs. Additionally, Interim has suffered and continues to suffer actual damages in an amount to be determined at trial related to its inability to manage Parkview's assets in order to preserve their value and thereby protect its interests in those assets as detailed in the APA.

## COUNT III
### Breach of Contract (APA)
**(Against Parkview)**

67. Interim incorporates the allegations of the foregoing paragraphs as if fully set forth herein.

68. Interim and Parkview are parties to the APA.

69. Under the terms of the APA, Parkview may not unilaterally terminate the contract.

70. Parkview breached and continues to breach the terms of the APA by attempting to unilaterally terminate the contract, thereby preventing Interim's contractual right to close the transaction by March 31, 2022.

71. Parkview's material breaches of the APA are the direct and proximate cause of damages to Interim.

72. As a proximate result of the acts alleged above, Interim has suffered and continues to suffer actual damages because it is unable to take advantage of the uniquely high-demand market for nursing home and care facilities. Interim has suffered and continues to suffer actual damages in an amount to be proven at trial.

73. Due to the uniquely high current market for nursing home and care facilities, which is likely to cool in the coming months, Interim cannot be adequately compensated in damages and specific performance is the appropriate remedy for Parkview's breach and repudiation of the APA.

74. Alternatively, Interim seeks an award of damages for Parkview's breach and repudiation of the APA.

## COUNT IV
### Breach of the Implied Covenant of Good Faith and Fair Dealing (APA)
(Against Parkview)

75. Interim incorporates the allegations of the foregoing paragraphs as if fully set forth herein.

76. As a party to the APA, and in reliance on the terms therein, Interim had the right to expect, and did reasonably expect, that Parkview would operate in good faith and fairly deal with Interim as the two sides worked to close the transaction detailed in the APA.

77. Instead, Parkview has acted arbitrarily, capriciously, and unreasonably by refusing to work with Interim to close the sale of its assets. Rather than work with Interim, Parkview informed Interim that it was unilaterally terminating the contract, something no term in the APA permitted it to do. Additionally, Parkview has attempted to devalue its assets in an effort to harm Interim.

78. Through its arbitrary, capricious, and unreasonable actions, Parkview has violated, nullified, and significantly impaired the benefit of the contract. Indeed, Parkview's utter refusal to work with Interim destroys the very essence of the APA: It prevents Interim from acquiring those assets to which it has a right under the plain terms of the contract.

79. As a proximate result of the acts alleged above, Interim has suffered and continues to suffer actual damages because it is unable to take advantage of the uniquely high market for nursing home and care facilities. Interim has suffered and continues to suffer actual damages in an amount to be proven at trial.

## COUNT V
### Tortious Interference with Business Expectancy
(Against Farmers and Gray)

80. Interim incorporates the allegations of the foregoing paragraphs as if fully set forth herein.

81. Under the terms of the APA, Interim agreed to purchase most of Parkview's assets. Accordingly, Interim had a valid business expectancy that it would indeed purchase Parkview's assets pursuant to the terms of the APA.

82. Gray knew about the APA and impending sale of Parkview's assets, as well as the rights and obligations of Parkview and Interim under the Management Agreement.

83. Gray actively and intentionally cajoled Parkview to repudiate the Management Agreement, and he discouraged Parkview from going through with the APA. By actively working to undermine the Management Agreement and the APA, Gray intentionally interfered with Interim's valid business expectancies, and this interference was unjustified.

84. As a result of Gray's unjustified, intentional interference, Parkview attempted to unilaterally terminate the Management Agreement and APA, directly and proximately causing harm to Interim.

85. As a proximate result of the acts alleged above, Interim has suffered and continues to suffer actual damages including but not limited to its inability to take advantage of

the uniquely high market for nursing home and care facilities. Interim has suffered and continues to suffer actual damages in an amount to be proven at trial.

86. At all relevant times, Gray acted within the scope of his employment with Farmers. As such, Gray's wrongdoing is imputed to Farmers through the doctrines of respondeat superior and vicarious liability.

## **PRAYER FOR RELIEF**

WHEREFORE INTERIM prays for:

A. On Count I, a declaratory judgment against Defendants that:

    i. Interim has complied with all terms and conditions of the APA and has not breached any terms or conditions of the APA;

    ii. Parkview has no right to unilaterally terminate the APA;

    iii. The APA is valid and enforceable; and

    iv. Parkview must work in good faith to close the transaction detailed in the APA as soon as possible, but no later than March 31, 2022.

B. A speedy hearing of the declaratory-judgment action;

C. On Counts II through V, an award of compensatory damages, in an amount to be determined at trial;

D. On Counts III through IV, an award of specific performance;

E. Interim's costs of suit;

F. An award of attorney fees; and

G. Such other and further legal and equitable relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial in Omaha on all issues raised by this Complaint and hereby provides notice to Defendants of such.

Dated: November 19, 2021.

                                  InterimLNHA, INC.,
                                  Plaintiff

BY:   */s/ Brian J. Fahey*

                                  Brian J. Fahey #25753
                                  Robert W. Futhey, #24620
                                  FRASER STRYKER PC LLO
                                  409 S. 17th Street
                                  500 Energy Plaza
                                  Omaha, Nebraska 68102
                                  Phone: (402) 341-6000
                                  Facsimile: (402) 341-8290
                                  bfahey@fraserstryker.com
                                  ATTORNEYS FOR PLAINTIFF